1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                   **CENTRAL DISTRICT OF CALIFORNIA**

10

11   SENTINEL OFFENDER SERVICES, LLC,       CASE NO. 8:14-cv-298-JLS-JPRx
     a Delaware limited liability company,

12

13              Plaintiff,                  **<span style="color:red;"><u>AMENDED</u></span> FINDINGS OF FACT AND
                                            CONCLUSIONS OF LAW**

14        vs.

15

16   G4S SECURE SOLUTIONS (USA) INC., a
     Florida corporation,

17

18              Defendant.

19

20

21

22

23

24

25

26

27

28

# I.    INTRODUCTION

Following a three-day bench trial in this matter, the Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52.  To the extent that any findings of fact are included in the Conclusions of Law section, they shall be deemed findings of fact, and to the extent that any conclusions of law are included in the Findings of Fact section, they shall be deemed conclusions of law.

# II.    FINDINGS OF FACT

## A.    Background

1.    Plaintiff Sentinel Offender Services, LLC ("Sentinel") is a company that provides offender management products and services to the corrections and judicial markets.  (Tr. 29:19–21.)

2.    Sentinel is a limited liability company organized under the laws of Delaware with its principal place of business in Irvine, California.  (Final Pretrial Conf. Order at 1, Doc. 171.)

3.    Bob Contestabile ("Contestabile") is the founder and CEO of Sentinel.  (Tr. 29:17.)

4.    Darryl Martin ("Martin") is currently COO of Sentinel.  (Tr. 231:18.)

5.    Leo Carson ("Carson") is currently the VP of Strategic Sales with Sentinel.  (Tr. 149:19.)

6.    Defendant G4S Secure Solutions (USA) Inc. ("G4S") is a security service company that was incorporated, and is headquartered, in Florida.  (Final Pretrial Conf. Order, Stipulated Facts ¶ 1.)

7.    Susanne Jorgensen ("Jorgensen") is a VP of G4S and CFO for the North America Region.  (Tr. 377:23, 378:2.)

8.    Prior to April 27, 2012, G4S had been the parent company of G4S Justice Services LLC ("Justice"), a limited liability company that provided electronic monitoring

services in the United States.  (Final Pretrial Conf. Order, Stipulated Facts ¶ 2.)

9.   The management team of Justice prior to April 27, 2012, consisted of Blake Beach ("Beach") as CEO, Martin as President, Mike Dean ("Dean") as VP of Sales, Carson as VP of Strategic Sales, Lisa Dunlin, and Peter Loughlin as CFO.  (Tr. 150:3–4, 233: 2, 233:11, 273:11–13, 273:22–24, 274:1–2.)

10.  On April 27, 2012, Justice was sold to Sentinel. (Tr. 32:11–14.)

**B.   North Carolina Department of Corrections Request for Proposal No. 4201118**

   **i.   Background**

11.  In 2005, Justice was awarded a contract from the North Carolina Department of Corrections (the "NCDOC").  (Tr. 155:13–15.)

12.  In 2008, the NCDOC issued a Request for Proposal ("RFP") that resulted in a second contract between Justice and NCDOC.  (Tr. 155:16–18, 206:20–207:2.)

13.  The second contract was to end on March 31, 2012, with the opportunity to have two one-year renewals.  (Tr. 155:15–25; *see also* Final Pretrial Conf. Order, Stipulated Facts ¶ 9.)

14.  On August 16, 2011, NCDOC issued another RFP (RFP No. 4201118) seeking bids from vendors to provide electronic monitoring services for four different functional areas pursuant to a new one-year contract, with the option for the NCDOC to extend the contract(s) for two additional one year periods.  (Final Pretrial Conf. Order, Stipulated Facts ¶ 8, Ex. 1-4.)

15.  Upon receiving the 2011 RFP, officers and management of Justice, including Martin, Carson, and Dean, reviewed the RFP's technical and administrative requirements.  (Tr. 156:19–157:1, 235:13–24, 236:19–21.)

16.  Martin, Dean, and Carson together worked as a team on the proposal in response to the NCDOC's RFP.  (Tr. 234:3–7.)

17.  Carson reported directly to Dean, and both Carson and Dean reported to Martin.

(Tr. 156:19–157:1.)

18. Dean was responsible for all of Justice's business development efforts and the management of procurement for government contracts. Carson was a member of Dean's sales team. (Tr. 233:10–20.)

19. Martin reported directly to Beach, and "would have communications upward to [G4S] Secure Solution[s]." (Tr. 226:2–7.)

### ii. 2011 RFP Requirements

20. The contract to be awarded under the 2011 RFP had substantially different requirements and terms than the incumbent contract that had been awarded to Justice pursuant to the 2008 RFP. (Tr. 351:1–23.)

21. Section III(A)(2)(d) of the 2011 RFP set forth technical requirements for all functional areas entitled "Offender Monitoring System Technical Specifications" and included the following requirements:

> x. It is mandatory that all software be compatible with Windows XP Professional, and at a future date as determined by DOC, Windows 7. All PC software shall function on a Windows XP SP3 Desktop Operating System and Microsoft Internet Explorer Version 7.

(Ex. 1-8.)

22. Section III(B)(3)(d) of the 2011 RFP entitled "GPS System Specifications" set forth certain requirements and stated in pertinent part:

> d. The system shall provide the following, including but not limited to:
>
> i. Establish inclusion and exclusion zones to include exclusion zones around all elementary and secondary schools in North Carolina (G.S. 14-208.18 (g1))

(Ex. 1-22.)

23. Section III(B)(7) of the 2011 RFP entitled "General Equipment Requirements" set forth additional requirements and stated in pertinent part:

> b. The Offeror shall provide all equipment that meets the highest level of ruggedness and durability available, in

3

accordance with current industry standards for the following features as applicable: . . . minimum internal operating battery life up to forty-eight (48) hours with a maximum recharge time of four (4) hours per day.

(Ex. 1-23.)

24. Section V(B) of the 2011 RFP entitled "THE PROCUREMENT PROCESS" stated:

6. State Agency employees will evaluate all proposals. All proposals will be initially classified as being responsive or non-responsive. If a proposal is found non-responsive, it will not be considered further. All responsive proposals will be evaluated based on stated evaluation criteria. Any references in an answer to another location in the RFP materials or Proposal shall have specific page numbers and sections stated in the reference. To be eligible for consideration, a Offeror <u>must</u> meet the intent of all requirements. Compliance with the intent of all requirements will be determined by the State. Responses that do not meet the full intent of functional requirements listed in this RFP may be subject to point reductions during the evaluation process or may be deemed non-responsive. Further a serious deficiency in the response to any one factor may be grounds for rejection regardless of overall score. Offerors are advised that DOC is not obligated to ask for, or accept after the closing date for receipt of proposal, data that is essential for a complete and thorough evaluation of the proposal.

(Ex. 1-30.)

25. Martin, Dean, and Carson specifically reviewed the RFP's language regarding non-responsive proposals in Section V(B). (Tr. 235:21–236:11.)

### iii. Communications Between Justice and NCDOC Regarding 2011 RFP

26. As early as August 2011, Martin, Carson and Dean became concerned that Justice might not be able to meet the technical specifications of the RFP as they were depending on their supplier, 3M/Elmotech, for equipment and software. (Tr. 157:2–8, 237:17–238:4.)

27. Carson, after discussing with Martin and Dean, forwarded the entire RFP to 3M/Elmotech and sought their opinion on whether their equipment and software would meet the RFP's requirements. (Tr. 157:9–20, 245:16–23.)

28. 3M/Elmotech's Vice President of Technical Services and Information Technology,

4

Ronen Shraga, after reviewing the technical requirements of the RFP, "identified a number of areas that would be challenges to 3M being able to comply." (Tr. 157:21–158:8.)

29. Carson then spoke with the NCDOC at a mandatory pre-bid meeting to seek relaxation of the technical specifications and submitted questions regarding the flexibility of those technical requirements. (Tr. 158:15–161:12, 246:6–10.)

30. Carson followed up his verbal questions with written questions to the NCDOC. (Tr. 159:16–23.)

31. Carson wrote: "As an RFP, with regard to use of the words 'shall' and 'must,' how will [the NCDOC] treat vendor responses to such items that do not address such requirements as worded and/or offer advanced and/or alternative methodologies for accomplishing the same overall requirements?" (Ex. 4-1; Tr. 160:1–9.)

32. On October 4, 2011, the NCDOC issued an Important Bid Addendum to RFP No. 4201118 ("Bid Addendum"). The Addendum stated, among other things, that its current contract with Justice would end on March 31, 2012. If all offerors were rejected, the State would cancel and negotiate the contract, and "the current contract would only be extended until a new one could be issued." (Final Pretrial Conf. Order, Stipulated Facts ¶ 9; Ex. 4.)

33. The NCDOC responded to Carson's question by repeating verbatim the same language from the 2011 RFP regarding its flexibility to determine compliance with the technical specifications. (*Compare* Ex. 1-30 at § V(B)(6) *with* Ex. 4-1 at ¶ A.1.)

34. On January 18, 2012, the NCDOC sent Justice a letter requesting clarification of its bid as to nineteen separate issues and requested that Justice provide a response by February 1, 2012. (Ex. 7.)

35. Question Nos. 3, 4, and 14 by the NCDOC asked whether Justice's proposed offender management software was compatible with the NCDOC's current

environment which used Internet Explorer Version 7.  (Ex. 7-1 to 7-2.)

36. Question No. 16 by the NCDOC asked whether Justice's system would allow exclusion zones around all primary and secondary schools in North Carolina.  (Ex. 7-2.)

37. Question No. 17 by the NCDOC asked whether the battery life of Justice's proposed equipment was at least 48 hours with a 4 hour charge time.  (Ex. 7-2.)

38. Although the NCDOC letter inquired into nineteen separate issues, on January 27, 2012, Carson sent an e-mail to Melissa Keefe ("Keefe") of 3M/Elmotech asking for her assistance in responding to NCDOC's clarification questions regarding just three of those nineteen issues: Internet Explorer 7, exclusion zones around schools, and 48 hour battery life.  (Ex. 8-6 to 8-7.)

39. The razor-sharp focus on those three issues shows that Justice knew exactly which issues were potentially the most problematic in its bid for the NCDOC contract.

40. Based on 3M's responses to Justice, Justice was concerned that it faced "exposure for potential non-compliance" on the clarification items pertaining to Internet Explorer 7, exclusion zones around schools, and 48 hour battery life.  (Ex. 8-1.)

41. On January 31, 2012, Justice submitted its response to the NCDOC's January 18, 2012 letter requesting clarifications.  (Ex. 9.)

42. Justice's response attempted to cast its technology in the best possible light.  (Ex. 9-4, 9-7.)

43. Justice responded that its proposed web based application was compatible with Internet Explorer 8 but was not compatible with Internet Explorer 7, and Justice proposed providing the NCDOC with a free upgrade at the inception of the contract.  (Ex. 9-4.)

44. Justice also responded that its proposed software could support up to 100 exclusion zones, and that an advanced version of the software capable of supporting 10,000 points of interest would be provided to the NCDOC upon

release at no additional cost.  (Ex. 9-7.)

45.  Justice further responded that the battery life of its devices could last 48 hours with a 4 hour charge time provided that a participant spend at least two hours charging his device in the middle of those 48 hours.  (Ex. 9-7.)

46.  Justice received no further communications from the NCDOC regarding Internet Explorer, exclusion zones, or battery life.  (Tr. 210:4–211:10; Ex. 78.)

47.  On February 22, 2012, the NCDOC extended the term of Justice's existing contract for six months, from April 1, 2012 through October 1, 2012, to enable the NCDOC to complete the bidding process.  (Ex. 10.)

48.  On March 28, 2012, the NCDOC requested that Justice extend its bid to RFP No. 4201118, and Justice agreed.  (Final Pretrial Conf. Order, Stipulated Facts ¶ 30.)

49.  Although Justice prepared for a demonstration, the NCDOC never requested that they do so; rather, Justice learned that between March 20 and May 25, 2012, BI and Satellite Tracking of People ("STOP")—competitors for the NCDOC contract—demonstrated their equipment and software to the NCDOC.  (Tr. 181:17–21; Ex. 103-2.)

### C.    Sentinel's Acquisition of Justice

#### i.    Letter of Intent and Due Diligence

50.  On November 21, 2011, G4S' parent company, G4S plc, entered into a Letter of Intent with Sentinel, for Sentinel to acquire Justice and G4S Justice Services (Canada), Ltd. ("Justice Canada") for $16 million subject to certain assumptions and conditions.  (Final Pretrial Conf. Order, Stipulated Facts ¶ 3.)

51.  Jorgensen was in charge of the deal for G4S, and she was assisted by Ian Green ("Green"), VP of Tax and Acquisitions of G4S; Kirk Domescik ("Domescik"), external counsel for G4S; and Beach and Martin from Justice.  (Tr. 254:8–255:25, 384:6–12; 443:5–9.)

52.  Around the time the Letter of Intent was signed by G4S plc, Sentinel sent a "Due

Diligence Request List" to G4S, seeking, among other things, general corporate information, financial information, and legal information, in the event the Letter of Intent was finalized. (Final Pretrial Conf. Order, Stipulated Facts ¶ 4; Ex. 5.)

53. Sentinel's "Due Diligence Request List" specifically requested under the section pertaining to "Contracts" a copy of "[a]ll significant vendor, customer and distributor contracts". (Final Pretrial Conf. Order, Stipulated Facts ¶ 5; Ex. 5-2.)

54. During November and December of 2011, G4S and Justice uploaded information sought by the Due Diligence Request List to a secure online data room to which Sentinel was provided access. (Final Pretrial Conf. Order, Stipulated Facts ¶ 6.)

55. Among other things, Justice uploaded redacted copies of the documents that made up its contract with the NCDOC. (Final Pretrial Conf. Order, Stipulated Facts ¶ 7.)

56. Sentinel negotiated a purchase price of $13 million during due diligence. (Tr. 32:21–33:4.)

57. When financing transactions of this nature in the offender management services industry, lenders often use a multiple of EBITDA (Earnings Before Interest, Tax, Depreciation, Amortization) as a benchmark to determine how much money they are willing to lend in a given transaction. (Tr. 31:2–22.)

58. The total EBITDA for Justice at the time was approximately $1.7 million, and the resulting multiple for Sentinel's mezzanine lender was "upwards of seven-plus." (Tr. 33:5–33:11.)

59. Sentinel's purchase of Justice used Justice's total EBITDA and the resulting multiple of EBITDA to determine what amount the lender would be putting forward. (Tr. 32:11–32:20.)

**ii.    Negotiation of the Purchase Agreement**

60. On February 22, 2012, counsel for G4S and Justice sent counsel for Sentinel the initial draft of the Purchase Agreement. (Final Pretrial Conf. Order, Stipulated

8

Facts ¶ 10.)

61. Between February 22, 2012 and April 27, 2012, counsel for Sentinel and counsel for G4S and Justice exchanged numerous drafts of the Purchase Agreement. (Final Pretrial Conf. Order, Stipulated Facts ¶ 11.)

62. On March 2, 2012, Sentinel provided a revised draft of the Purchase Agreement to G4S. (Final Pretrial Conf. Order, Stipulated Facts ¶ 12.)

63. Sentinel's March 2, 2012 draft of the Purchase Agreement sought to include a Section 1.4 entitled "Calculation of Estimate[d] Value of the Material Contracts" that would, among other things, allow Sentinel to set aside in an escrow account an agreed upon value for some of Justice's material customer contracts, and have the funds associated with each contract released to Sentinel if: (1) the contract was not renewed on or before July 1, 2012; (2) the contract was in the process of being bid prior to July 1, 2012; (3) the contract was required to go to bid within six months of the Closing Date of the Purchase Agreement; or (4) the contract was not assigned, or was terminated, by the customer within six months of the closing date based on Sentinel's acquisition of Justice. (Final Pretrial Conf. Order, Stipulated Facts ¶ 13.)

64. Sentinel's March 2, 2012 draft of the Purchase Agreement also sought to include a Section 4.25(a)(i) to the Article 4 Representations and Warranties Concerning the Companies that provided, among other things, that "all Material Customers continue to be customers of Justice and no Material Customer has materially reduced or disclosed an intention to materially reduce its business with Justice below the levels achieved during such year, *and there is no reason to believe that any such material reduction is likely to occur.*" (Ex. 112-29.)

65. During the negotiation of the Purchase Agreement, Sentinel was aware that two of Justice's top 15 customers had pending RFPs to vendors. (Final Pretrial Conf. Order, Stipulated Facts ¶ 18.)

66. Sentinel had been aware that NCDOC was out to bid since September of 2011 and that Justice was using 3M/Elmo Tech equipment. (Tr. 96:2–97:1; Ex. 105.)

67. The RFP had no impact on Sentinel's decision to go forward with purchasing Justice, its only effect would be the price Sentinel was willing to pay. (Tr. 97:2–98:8.)

68. On March 6, 2012, Contestabile, Hans Kintsch, and Mark Contestabile had an in-person meeting with Jorgensen, Green, and Beach. (Final Pretrial Conf. Order, Stipulated Facts ¶ 14.)

69. Prior to that meeting, G4S and Sentinel had already agreed upon the price for the acquisition of Justice. (Tr. 102:5–12.)

70. The March 6, 2012 meeting focused primarily on issues pertaining to the transition of Justice to Sentinel, including employee issues related to Justice's various locations. (Final Pretrial Conf. Order, Stipulated Facts ¶ 15.)

71. On March 7, 2012, Contestabile, Kintsch and Mark Contestabile, along with Sentinel's counsel, Jay Thompson, had an in-person meeting with Green, Jorgensen, and Domescik. (Final Pretrial Conf. Order, Stipulated Facts ¶ 16; Tr. 49:11, 496:21–497:3.)

72. The March 7, 2012 meeting focused primarily on issues pertaining to the terms of the Purchase Agreement and documents related thereto. (Final Pretrial Conf. Order, Stipulated Facts ¶ 17.)

73. At the March 7 meeting, Contestabile raised the issue of outstanding bids, including Justice's bid with the NCDOC, as a topic of discussion. (Tr. 47:3–8, 399:12–15.)

74. Contestabile sought an agreement to place the NCDOC contract in an escrow account, and to hold back a portion of the purchase price in the event the contract was not awarded to Justice. (Tr. 47:9–17, 49:12–18, 399:12–24.)

75. G4S proposed a "Holdback" or Adjustment Provision as an alternative to the

escrow provision.  (Ex. 114-7.)

76. During negotiations, Sentinel requested that the Adjustment Provision apply to the two top Justice customers that had pending RFPs:  NCDOC and Cook County.  (Final Pretrial Conf. Order, Stipulated Facts ¶ 19.)

77. After receiving assurances from G4S regarding the NCDOC bid, Sentinel backed off its request that the NCDOC bid be included in the Adjustment Provision.  (Tr. 55:18–25, 60:6–17.)

78. Only Justice's bid with Cook County was included in the Adjustment Provision in the final version of the Purchase Agreement.  (Ex. 20-10, 20-59.)

79. The Holdback or Adjustment Provision would decrease Sentinel's purchase price in the event Justice's bid with Cook County was rejected.  (Tr. 400:1–4; Ex. 114-7.)

### iii.    Email Regarding Justice's Probability of Winning NCDOC Bid

80. On March 19, 2012, Contestabile sent an e-mail to Jorgensen requesting additional information including "Management (Darryl [Martin] or Blake [Beach]) expectations regarding retention of the two accounts of the top 15 that are currently out to bid" stating that Sentinel was seeking "anything that we can produce that will give comfort to the lender regarding our ability to retain and grow the revenue side of the business."  (Final Pretrial Conf. Order, Stipulated Facts ¶ 20.)

81. That same day, Jorgensen forwarded Contestabile's email to Martin and Beach, among others, to obtain their input.  (Final Pretrial Conf. Order, Stipulated Facts ¶ 21.)

82. Jorgensen asked Martin to provide specific information in response to Contestabile's request.  (Tr. 257:1–4.)

83. On March 20, 2012, in response to Jorgensen's request for information, Martin sent Jorgensen an e-mail summarizing the information requested by Contestabile

and stating that in management's view there appeared to be three viable bidders for the NCDOC RFP and that the service element of Justice's bid was "solid and will not cause the agency to entertain other proposals." (Ex. 48; Final Pretrial Conf. Order, Stipulated Facts ¶ 22.)

84. Martin further stated that "price has been identified as a major concern of the customer" but that notwithstanding price concerns, Justice had a 50% probability of being awarded the contract and "if price becomes a significant factor, I am lowering my expectations to 40%." (Ex. 48; Final Pretrial Conf. Order, Stipulated Facts ¶ 23.)

85. Martin also attached spreadsheets prepared by Dean to the email he sent to Jorgensen. (Ex. 48.) The spreadsheets assigned specific percentages to various opportunities Justice was pursuing, including the NCDOC. (Ex. 48-19.)

86. The spreadsheet assigned just a 40% probability of Justice winning the NCDOC contract. (Ex. 48-19.)

87. Jorgensen therefore knew that Martin believed Justice had a 40% to 50% chance of winning the NCDOC bid and that Dean assigned a 40% chance of Justice winning the NCDOC bid.

88. Jorgensen sent Martin a follow-up email on March 21, 2012 requesting that Martin "please remove customer names and customer references and send it back to me." (Ex. 17-3.)

89. Later the same day, Martin re-sent "updated spreadsheets without names, name references, or states," and Jorgensen replied that she "will go through everything and send to Bob later." (Ex. 17-1.)

90. Also on March 21, 2012, in a separate email chain, Beach recommended that Jorgensen remove the specific probability percentages from her response to Contestabile. (Final Pretrial Conf. Order, Stipulated Facts ¶ 24; Ex. 81-1.)

91. Jorgensen's revised summary retained the language that "price has been identified

as a major concern of the customer," and removed the specific probability percentages.

92. Despite never being advised to do so, Jorgensen added language stating that Justice had a "good probability" of being awarded the contract. (Final Pretrial Conf. Order, Stipulated Facts ¶ 25.)

93. Before sending the revised summary to Sentinel, Jorgensen sent an e-mail to Martin and Beach, asking whether they agreed with the statements in the draft revised summary and whether "we need to add/delete anything." (*Id.* ¶ 26.)

94. On March 21, 2012, Jorgensen received an email from Beach stating the revised summary "sounds fine" but recommending she remove the customer name in the second paragraph. (*Id.* ¶ 27.)

95. On March 21, 2012, Martin replied to Beach's email, stating "Thanks for connecting on the clarifications. I will update you after I meet with Bob." (Tr. 313:25–314:7, 453:5–11; Ex. 143.)

96. Neither Martin nor Beach mentioned that Justice's bid was not in compliance with the three requirements that it identified as potentially the most problematic in its efforts to win the NCDOC contract.

97. On March 21, 2012, Jorgensen sent an e-mail to Contestabile and Kintsch, with a copy to Beach and Martin, concerning management's views of Justice being awarded the contract for the two main customers that were out for bid. (Final Pretrial Conf. Order, Stipulated Facts ¶ 29.)

98. The email stated that Justice had a "good probability" of winning the NCDOC bid. (Ex. 16-1.)

99. Customer # 1 on Jorgensen's email was NCDOC. (Ex. 16-1; Tr. at 272:13–15.)

100. No one from G4S or Justice ever told Sentinel that Justice had only a 40–50% chance of getting the NCDOC contract. (Tr. 61:2–11.)

101. No one from G4S or Justice ever told Sentinel that its products did not meet the NCDOC's requirements regarding compatibility with Internet Explorer 7, the provision of exclusion zones around all primary and secondary schools, or 48-hour battery life. (Tr. 59:14–60:3.)

102. At trial, Jorgensen gave several reasons to explain why she included the "good probability" statement in her email. She testified that because there were three "viable" bidders, all things being equal, Justice would have the best chance to win the bid. (Tr. 413:22–414:6, 414:23–415:1.) She further testified that Martin had stated the "service element of the offering was solid" which sounded optimistic. (Tr. 414:9–12.) Jorgensen also pointed to the attached bids tab in Martin's e-mail which gave both Cook County and the NCDOC a 40% probability of renewal (the highest probability percentage given to any of the contracts out for bid) and noted that Martin had given both bids a higher percentage (50%) in his e-mail. (Tr. 414:18–415:1, Ex. 48-17 to 48-19.) Finally, Jorgensen testified that she relied on the fact that Martin had given Cook County a 50% chance of winning and he had stated that Justice felt "very confident" about their chances of winning that bid. (Tr. 415:6–9.)

103. The Court finds Jorgensen's testimony regarding her reasons for including the "good probability" statement lacking in credibility. Jorgensen's testimony at trial frequently appeared calculated and was often evasive. At one point the Court had to admonish her to answer a straightforward question regarding the employment of one of her superiors at G4S. (Tr. 425:11–426:20.) Her testimony explaining her reasoning behind the "good probability" statement also appeared calculated, particularly with respect to the existence of three "viable" bidders and how that led her to conclude Justice had a "good probability" to win the NCDOC bid. Specifically, she had no information that the other two viable bidders each had a 30% chance of winning the bid. It could just as easily have been the case that one

of the other bidders had a better chance than Justice.  The Court therefore declines to credit Jorgensen's testimony where it has not been corroborated by other evidence.  *Cf. Lopez-Umanzor v. Gonzales*, 405 F.3d 1049, 1059 (9th Cir. 2005) ("Our law has long recognized that a person who is deemed unbelievable as to one material fact may be disbelieved in all other respects."); *Hattem v. United States*, 283 F.2d 339, 343 (9th Cir. 1960) (concluding that the district court correctly instructed the jury that it could "disregard all of the testimony" of a witness who "has wil[l]fully testified falsely as to any material fact in the case").

104. The Court finds that a 40% to 50% chance of winning a bid is not a "good probability" and cannot reasonably be considered to be the equivalent of a good probability.  Therefore, Jorgensen's statement, as a representative of G4S, that Justice had a "good probability" of winning the NCDOC bid was a knowing misrepresentation to Sentinel.

105. Nor was it merely a casually made statement.  G4S made this misrepresentation in the course of the sale of the business in response to Sentinel's specific inquiry about the strength of the NCDOC bid.  It was made with the intent to induce Sentinel to act in reliance upon it.  G4S knew that Sentinel inquired into Justice's chances of winning the NCDOC bid in order to "give comfort" to its lender on the deal.  (Final Pretrial Conf. Order, Stipulated Facts ¶ 20.)  G4S also knew that Justice's probability of winning the NCDOC bid was important to Sentinel because Sentinel had previously tried both to set aside the value of the NCDOC contract in an escrow account and to include the NCDOC contract in the Adjustment Provision of the Purchase Agreement.  (Tr. 47:12–17; Final Pretrial Conf. Order, Stipulated Facts ¶¶ 13, 19.)  Accordingly, the Court finds that G4S made the "good probability" statement to induce Sentinel to continue with the Purchase Agreement as it had been negotiated up to that point.

### iv.    The Purchase Agreement

106. On April 27, 2012, G4S, Justice, Justice Canada, and Sentinel entered into the Purchase Agreement.  (Final Pretrial Conf. Order, Stipulated Facts ¶ 31.)

107. Section 1.2 of the Purchase Agreement sets a Purchase Price of $13 million dollars.  (Ex. 20-9 to 20-10.)

108. Section 1.1 of the Purchase Agreement provides that Sentinel will enter into an Inventory Purchase Agreement ("IPA") with Justice Canada whereby Sentinel will purchase existing inventory being maintained by Justice Canada.  (Ex. 20-9.)

109. Section 8.18 of the Purchase Agreement entitled "Incorporation of Exhibits and Disclosure Schedule" provides that the "Exhibit and Disclosure Schedule identified in this Agreement are incorporated herein by reference and made a part hereof."  (Ex. 20-54.)

110. The IPA was an exhibit of, and incorporated by reference into, the Purchase Agreement.  (Ex. 20-8, 20-54, 20-205 to 20-231.)

111. Section 1.3 of the Purchase Agreement (the "Adjustment Provision") provides for an adjustment of the Purchase Price after Closing for certain customer contracts out for re-bid as of April 27, 2012.  (Ex. 20-10 to 20-11.)

112. Section 1.3 of the Disclosure Schedule identifies only one contract, "Cook County, Illinois."  (Ex. 20-59.)

113. If the customer fails to extend the Cook County contract in favor of Justice, then the Purchase Price would be decreased by $150,000.  (Ex. 20-59.)

114. The first unnumbered paragraph of Article 4 of the Purchase Agreement states that "Member and the Companies represent and warrant to Purchaser that the statements contained in this Article 4 are correct and complete as of the Closing Date . . . ."  (Ex. 20-16.)

115. Section 4.23 of the Purchase Agreement states the following:

　　4.23 <u>Disclosure</u>. The representations and warranties contained in this Article

4 do not contain any untrue statement of material fact or omit to state any material fact necessary to make the statements and information contained in this Article 4 not misleading.

(Ex. 20-30.)

116. Section 4.25(a) of the Purchase Agreement states the following:

(a) <u>Section 4.25 of the Disclosure Schedule</u> sets forth a complete and accurate list of Justice's top fifteen customers based on sales revenue for the year ended December 31, 2011 (the "Material Customers"), together with the amount received during such period. Except as set forth on Section 4.25 of the Disclosure Schedule, (i) all Material Customers continue to be customers of Justice and ***no Material Customer has materially reduced or disclosed an intention to materially reduce its business with Justice below the levels achieved during such year*[;]** *(ii) no Material Customer has terminated its relationship with Justice or has threatened to do so*; and (iii) Justice is not involved in any claim, dispute or controversy with any Material Customer or any of its other customers that, individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(Ex. 20-30 to 20-31 (emphasis added).)

117. The Disclosure Schedule for Section 4.25(a) lists as (2), "North Carolina Department of Correction, Division of Community Correction" as one of the "Material Customers." (Ex. 20-175.)

118. The parties entered into the IPA on April 27, 2012 which contained a four year term. (Ex. 20-206.)

119. Pursuant to Section 7 of the IPA, Sentinel would draw down inventory and make payments for it to Justice Canada, with the remaining balance due within fifteen days of the expiration of the IPA (or by May 12, 2016). (Ex. 20-206 to 20-207.)

**D.   <u>NCDOC's Rejection of Justice's Bid</u>**

120. On June 6, 2012, Sentinel received the NCDOC's letter rejecting its bid. (Ex. 21.)

121. The letter stated that Justice's bid did not meet the mandatory requirement of the RFP. (Ex. 21-1.) It cited Justice's response that its proposed software was not compatible with Internet Explorer 7. (Ex. 21-2.) It also stated that Justice's responses to the exclusion zones and 48-hour battery life technical requirements were deemed non-responsive and eliminated Justice from Functional Area No. 1.

17

(Ex. 21-3 to 21-5.)

122. The NCDOC concluded that it found G4S did not meet the required specifications referenced in the letter and was "no longer considered to be a viable candidate." (Ex. 21-5.)

123. The NCDOC never opened the pricing package from G4S Justice. (Tr. 561:5–15.)

124. Had Contestabile known that the NCDOC was not going to be a Justice customer, Sentinel would have offered a lower purchase price for Justice. (Tr. 143:9–18.)

### D. Sentinel's Failure to Perform Under the IPA

125. Sentinel initially made payments under the IPA but stopped doing so sometime in 2014. (Tr. 82:3–21, 478:23–479:8.)

126. On July 8, 2014, G4S Secure Solutions (Canada) Ltd. ("G4S Canada") filed a complaint against Sentinel for the balance due under the IPA. (Ex. 142.)

127. Sentinel and G4S Canada entered into a Settlement Agreement on August 18, 2014. (Ex. 140.)

128. Sentinel resumed making monthly payments for a time, and then stopped doing so. (Tr. 86:5–10, 482:14–16.)

129. Sentinel's remaining balance, including interest, under the IPA is about $1 million. (Tr. 483:6–8.)


## III. CONCLUSIONS OF LAW

130. Under California law, a valid choice of law provision will be enforced where the chosen state "has a substantial relationship to the parties or the transaction." *See ABF Capital Corp. v. Osley*, 414 F.3d 1061, 1065 (9th Cir. 2005). "A substantial relationship exists where one of the parties is domiciled or incorporated in the chosen state." *Id.*

131. California law applies because there is a California choice of law provision in the Purchase Agreement stating that the Purchase Agreement "SHALL BE

GOVERNED BY, CONSTRUED AND ENFORCED UNDER AND IN
ACCORDANCE WITH THE LAWS OF THE STATE OF CALIFORNIA" and
Sentinel's principal place of business is in California. (Ex. 20-52; Final Pretrial
Conf. Order at 1.)

### A. Breach of Contract and Breach of Representations and Warranties

132. For Sentinel to prevail on its claims for breach of contract and breach of
representations and warranties, it must prove by a preponderance of the evidence:
(1) the existence of a contract, (2) Sentinel's performance or excuse for non-
performance, (3) G4S' breach, and (4) damages to Sentinel therefrom. *Acoustics,
Inc. v. Trepte Constr. Co.*, 14 Cal. App. 3d 887, 913 (1971).

133. Sentinel and G4S entered into a valid contract when they entered into the Purchase
Agreement.

134. Sentinel had performed all its obligations under the Purchase Agreement as of the
time of G4S' breach.

135. Based on the Court's findings of fact, G4S did not breach Sections 4.23 and
4.25(a) of the Purchase Agreement.

136. Although G4S failed to notify Sentinel that Justice's bid did not meet the three
requirements that the NCDOC had specifically asked about in its January 18, 2012
letter, the Court finds that the NCDOC's correspondence with Justice does not
constitute an "intention to materially reduce its business with Justice" nor did it
constitute a threat to do so. (*See* Ex. 20-30 to 20-31.)

137. Accordingly, the Court concludes that Sentinel has failed to prove that G4S
breached the terms of the Purchase Agreement.

### B. Fraud and Negligent Misrepresentation

138. To assert fraud, Sentinel must establish: "(a) misrepresentation (false
representation, concealment, or nondisclosure); (b) knowledge of falsity (or

'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 974 (1997) (citation omitted).

139. To assert negligent misrepresentation, Sentinel must establish the same elements except that, rather than demonstrating knowledge of falsity, the plaintiff must demonstrate that G4S had no reasonable grounds for believing the representation to be true. *See Fox v. Pollack*, 181 Cal. App. 3d 954, 962 (1986).

140. Based on the Court's findings of fact, G4S misrepresented Justice's chances of winning the NCDOC bid to Sentinel when G4S, through Jorgensen, sent the email to Contestabile stating that Justice had a "good probability" of winning the NCDOC bid. The misrepresentation was compounded by G4S' failure to inform Sentinel that Justice's NCDOC bid was non-compliant with three requirements that the NCDOC had specifically asked about in a follow-up letter and that Justice and G4S knew were potentially the most problematic in Justice's efforts to win the NCDOC contract.

141. Sentinel justifiably relied upon the "good probability" statement.

142. By relying upon Jorgensen's "good probability" statement, Sentinel suffered damages by paying more than it otherwise would have to acquire Justice.

143. Accordingly, the Court concludes that G4S is liable for fraud and negligent misrepresentation.

### C. **Damages**

144. Sentinel seeks both compensatory and punitive damages for G4S' conduct. (Sentinel's Proposed Findings of Fact and Conclusions of Law ¶¶ 187, 201, 208, Doc. 184-1.)

#### i. **Compensatory Damages**

145. The measure of damages for tortious conduct not arising out of breach of contract is "the amount which will compensate for all the detriment proximately caused

thereby, whether it could have been anticipated or not." Cal. Civ. Code § 3333.

146. Sentinel requests compensatory damages in the amount of $9,326,080. (Sentinel's Proposed Findings of Fact and Conclusions of Law ¶ 201.) This figure is based on the value of the NCDOC contract in terms of EBITDA. (*Id.* ¶ 195.) Sentinel asserts that because Justice failed to win the NCDOC contract, it was harmed by the full value of that contract (times a 7.5 multiple) plus the interest it had to pay on the additional funds it borrowed to finance its purchase of Justice. (*Id.*)

147. The Court finds this amount excessive and completely lacking in support in light of the fact that Sentinel entered into the Purchase Agreement knowing that the NCDOC contract was out to bid and that there was a possibility that Justice would not win the contract. (Tr. 96:2–97:1; Ex. 105.) In other words, while Sentinel may have been misled as to the level of risk it was incurring on the bid for the NCDOC contract, it was clearly aware that a risk existed, as the contract had not yet been awarded to Justice. Sentinel paid the purchase price knowing that it might not end up with the NCDOC contract. The "detriment proximately caused" by G4S' fraud therefore cannot be the full value of the NCDOC contract.

148. Rather, the harm Sentinel suffered is that it overpaid for Justice believing that Justice's chance of winning the NCDOC bid was higher than it was. Moreover, the evidence at trial reflects that, had the true nature of the risk been disclosed, the NCDOC contract would have been included in the Adjustment Provision of the Purchase Agreement.

149. Therefore, the Court finds that using Section 1.3 of the Purchase Agreement as a guide is a reasonable method of calculating damages as it is based on how the parties actually negotiated the risk attendant to an outstanding bid for a contract with a top Justice customer.

150. Under the Adjustment Provision in Section 1.3, the parties agreed to a post-closing price purchase price adjustment by assigning values to the potential loss of three

different contracts. The assigned values averaged 22.9% of the prior year's revenue for each contract. (Tr. 541–542:8; Ex. 20-10 to 20-11, 20-59.)

151. The NCDOC's revenue from 2011 was $1,988,843. (Ex. 145-6; Tr. 541:25–542:2.)

152. Applying the 22.9% average to the NCDOC's 2011 revenue results in a $456,328 purchase price adjustment. (Tr. 542:1–4; Ex. 145-6.)

153. G4S argues that Sentinel failed to mitigate damages when it waited to accept assignment of Justice's bid until after it discovered that Justice was not being awarded the NCDOC contract. (G4S' Proposed Findings of Fact and Conclusions of Law ¶¶ 362–64.)

154. However, Sentinel had no obligation to accept assignment of Justice's bid prior to the NCDOC's rejection in order to mitigate damages. Before the NCDOC informed Sentinel on June 6, 2012, that it rejected Justice's bid, (Ex. 21), Sentinel reasonably believed that Justice had a good probability of winning the NCDOC contract based on G4S' misrepresentations. Sentinel therefore had no reason to act to mitigate damages prior to the NCDOC's June 6 rejection letter.

155. The Court therefore awards compensatory damages of $456,328 to Sentinel for G4S' ~~breach of contract,~~ fraud~~,~~ and misrepresentation.

   ii.    **Punitive Damages**

156. Sentinel also requests punitive damages in the amount of three times compensatory damages. (Sentinel's Proposed Findings of Fact and Conclusions of Law ¶ 208.)

157. California law provides that in an action for breach of an obligation "not arising from contract," a plaintiff may recover punitive damages where "it is proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud, or malice." Cal. Civ. Code § 3294(a). "Fraud" under Section 3294 means "an intentional misrepresentation, deceit, or concealment of a material fact known

to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury." Cal. Civ. Code § 3294(c)(3).

158. In considering punitive damages, a court is to consider "(1) the nature of the defendants' acts; (2) the amount of compensatory damages awarded; and (3) the wealth of the defendants." *Prof'l Seminar Consultants v. Sino Am. Tech. Exch. Council*, 727 F.2d 1470, 1473 (9th Cir. 1984) (citing *Neal v. Farmers Ins. Exchange*, 21 Cal. 3d 910, 928 (1978)).

159. Courts evaluating the nature and reprehensibility of a defendant's conduct consider whether (1) "the harm caused was physical as opposed to economic"; (2) "the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others"; (3) "the target of the conduct had financial vulnerability"; (4) "the conduct involved repeated actions or was an isolated incident"; and (5) "the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003). "It should be presumed a plaintiff has been made whole for his injuries by compensatory damages, so punitive damages should only be awarded if the defendant's culpability, after having paid compensatory damages, is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence." *Id.*

160. Here, the Court concludes that the nature of G4S' fraud and misrepresentation does not merit punitive damages. Although Jorgensen knowingly misrepresented Justice's chances of winning the NCDOC bid with her "good probability" statement, the Court finds that her intentional misrepresentation is insufficiently reprehensible when considered in light of the aforementioned factors. The harm suffered by Sentinel was economic rather than physical; the misrepresentation did not put at risk anyone's health or safety; there is insufficient evidence that Sentinel

was financially vulnerable; and Jorgensen made her "good probability" statement only once.

## IV.  **CONCLUSION**

For the foregoing reasons, Sentinel is entitled to $456,328 in damages plus statutory interest on its ~~breach of contract,~~ fraud~~,~~ and negligent misrepresentation claims.

Sentinel shall submit a proposed judgment forthwith.

DATED: ~~January 27~~April 26, 2017

_____
HON. JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE